UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
EMANUELE LOGIUDICE,

                          Petitioner,                  REPORT AND
                                                                    RECOMMENDATION
   -against-

                                                                     01 CV 88 (SJ) (RML)

UNITED STATES OF AMERICA,

                          Respondent.
---------------------------------------------------------X
LEVY, United States Magistrate Judge:

       By order dated March 21, 2007, the Honorable Sterling Johnson, Jr., United States District Judge, referred this matter to me for a Report and Recommendation on petitioner's motion to vacate his sentence. I conducted an evidentiary hearing on July 11, 2007 and received supplemental submissions thereafter. For the reasons stated below, I respectfully recommend that the petition be denied.

## BACKGROUND AND FACTS

       On April 2, 1999, petitioner Emanuele Logiudice ("petitioner" or "Logiudice") was convicted in this court of conspiring to import heroin, importing heroin, possessing heroin with intent to distribute, and distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. §§ 841, 952, 960, and 963. See United States v. Logiudice, 201 F.3d 433, 1999 WL 1295822, at *1 (2d Cir. 1999). He was sentenced to 240 months imprisonment (id.), and remains incarcerated. He now moves pursuant to 28 U.S.C. § 2255[1] to vacate his sentence on the ground that his trial counsel, David Breitbart, Esq. ("trial counsel"), provided ineffective

---

[1] 28 U.S.C. § 2255 provides, in relevant part: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States."

assistance by failing to advise petitioner that, due to a previous drug conviction, he faced a minimum sentence of twenty years imprisonment, and by leading petitioner to believe that he would very likely be acquitted at trial. (See Letter of Mark S. DeMarco, Esq., dated Aug. 13, 2007 ("DeMarco Ltr.").)

It is undisputed that, during the course of plea negotiations, the government made two offers to Logiudice: first a sentence of eight years (96 months) and then a sentence of ten years (120 months). See Logiudice v. United States, 354 F. Supp. 2d 242, 245 (E.D.N.Y. 2005). According to Logiudice, trial counsel assured him that, if convicted, the maximum sentence he faced was twelve years (144 months). Id. Logiudice claims that, in reliance on trial counsel's advice, he rejected both offers, maintained his innocence, and proceeded to trial. Id. He argues that, had he known about the mandatory twenty-year minimum sentence and the likelihood of conviction, he would have accepted a plea offer. (DeMarco Ltr. at 4.)

## DISCUSSION

The benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). In the Second Circuit, a petitioner claiming ineffective assistance of counsel must demonstrate that: (1) his counsel's performance was deficient as measured by objective professional standards, and (2) this deficiency in performance prejudiced his defense. See Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000); see also McKee v. United States, 167 F.3d 103, 106 (2d Cir. 1999). A petitioner must demonstrate both elements before it can be said that "the conviction resulted from a breakdown in the adversary process that renders the result unreliable."

See Strickland, 466 U.S. at 687.

The performance inquiry is highly contextual; it is concerned with whether the attorney's actions were objectively reasonable considering all the circumstances. See Purdy, 208 F.3d at 44. Counsel's challenged conduct must be evaluated in light of the facts of the particular case and from the perspective of the attorney at the time of representation. See Wiggins v. Smith, 539 U.S. 510 (2003); see also Ocampo v. United States, No. 99-CV- 6727, 2004 WL 611959, at *4 (E.D.N.Y. Mar. 22, 2004). In addition, there is a strong presumption that an attorney's performance was reasonable, and courts are highly deferential to the decisions made by an attorney during representation. See Strickland, 466 U.S. at 689. A convicted defendant making a claim of ineffective assistance must overcome this presumption by identifying the attorney's specific acts or omissions that fell below an objective standard of reasonableness. Id. at 687.

The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," and has instead suggested that the measure of performance be judged under "prevailing professional norms." Id. at 688. Similarly, neither the Supreme Court nor the Second Circuit has opined specifically on "a criminal defense lawyer's duty when a defendant's best interest clearly requires that a proffered plea bargain be accepted, but the defendant, professing innocence, refuses to consider the matter." Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996). On one hand, defense counsel has a duty to provide professional advice on the crucial decision of whether to plead guilty. Id. at 497. As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should inform the defendant of the strengths and weaknesses of the government's case, as well as the alternative sentences to which

the defendant will most likely be exposed.  See Purdy, 208 F.3d at 45 (citing United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998)).  On the other hand, the ultimate decision whether or not to plead guilty must be made by the defendant.  It is crucial that counsel refrain from coercing a client into either accepting or rejecting a plea offer.  See Jones v. Murray, 947 F.2d 1106, 1111 (4th Cir. 1991).  Therefore, when advising a client whether or not to plead guilty, counsel should take into account the following factors: (1) the defendant's chances of prevailing at trial; (2) the disparity in sentencing after a full trial as compared to a guilty plea; (3) whether the defendant has maintained his innocence; and (4) the defendant's comprehension of the various factors that will inform his plea decision.  See Purdy, 208 F.3d at 45.

For example, in Boria v. Keane, the petitioner was convicted in state court and sentenced to twenty years to life resulting from a "buy and bust" arrest.  He claimed that he was deprived of adequate assistance of counsel when his attorney allowed him to reject an offer of a plea bargain that would have resulted in a one to three year sentence.  99 F.3d at 494.  Under the circumstances of that case, the court held that defense counsel's performance fell below an objectively reasonable standard of professional conduct because counsel not only failed to provide an ultimate opinion as to the wisdom of a plea, but also "never gave his client any advice or suggestion as to how to deal with the People's offered plea bargain."  Id. at 498.  The court found that if there had been a reasonable chance of acquittal, defense counsel might have been confronted with the strategic decision of whether or not to accept the plea bargain.  Id.  However, in the absence of any strategic decision, defense counsel failed to uphold his constitutional duty to give "professional advice on this crucial decision."  Id.

Likewise, in United States v. Gordon, the court held that the petitioner was denied

effective assistance of counsel at plea negotiations when counsel grossly underestimated his client's potential maximum sentence. 156 F.3d at 376. The defendant was indicted on six counts in federal court, and his counsel informed him that a conviction would result in a maximum sentence of 120 months and that pleading guilty to one count would reduce it down to 92 to 115 months. Id. at 377. After a bench trial, the defendant was convicted on all counts and sentenced to 262 to 327 months. Id. The court noted that "[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty." Id. at 380 (citing United States v. Day, 969 F.2d 39, 43 (3d Cir. 1992)). The Second Circuit agreed with the district court that counsel's legal assistance "fell below the prevailing professional norms for advising a client during plea negotiations of his maximum exposure to imprisonment at sentencing." Id. at 380.

However, in Purdy v. United States the court held that the "reasonable professional conduct" standard does not in all circumstances require counsel to provide an explicit opinion as to whether his or her client should accept a plea offer. 208 F.3d at 41. In that case, the defendant was convicted in federal court, and then claimed that his trial counsel failed to communicate to him certain representations of the federal prosecutor and to advise him to accept a plea offer. Id. at 42. Although defense counsel did not explicitly tell the defendant whether or not to accept the plea offer, he had repeatedly advised the defendant of the strengths and weakness of the government's case and of the likely sentence he would face after trial. Id. at 44. The court found that these actions reasonably fulfilled the attorney's obligation to advise the defendant while avoiding the danger of improper coercion. Id. at 46. Furthermore, the court rejected the argument that Boria established a *per se* rule that counsel must advise a defendant

whether or not to plead guilty. The court distinguished Boria on its facts, holding that reasonable professional conduct does not always require a lawyer to give an explicit opinion as to whether a client should accept a plea offer. See Purdy, 208 F.3d at 48.

In the instant case, Logiudice argues that his trial counsel's performance fell below objectively reasonable standards of professional conduct. He contends that counsel repeatedly assured him that he could "win the case" and advised him that he faced a maximum of twelve years if convicted. (See Affadavit of Emanuele Logiudice, dated Jan. 11, 2001.) He also maintains that trial counsel failed to advise him of the prejudicial effect of his prior conviction. (Id.)

I conducted a hearing on July 11, 2007, at which three witnesses testified: David Breitbart, Emanuele Logiudice, and former AUSA Jody Avergun. (See Transcript of Hearing, dated July 11, 2007 ("Tr.").) Mr. Breitbart, a former Assistant District Attorney with approximately thirty-eight years of experience in criminal litigation, stated that he recalled becoming "very well acquainted" with Logiudice, as well as his wife and daughters, during the course of his representation of petitioner in connection with this case. (Id. at 4.) He explained that he met with Logiudice and his family members "periodically to answer any questions they had, to go over evidence, to discuss the case." (Id. at 4-5.) He testified that he specifically recalled attending a meeting with his client at Ms. Avergun's office, during which Logiudice was offered a plea deal of eight years. (Id. at 6.) According to Mr. Breitbart, the Assistant United States Attorney cautioned that if Logiudice did not accept the offer, "they were going to supersede by insisting that it be treated as a second felony conviction for narcotics, which would have doubled his exposure." (Id.) Mr. Breitbart testified that, after this meeting, he explained to

his client that "if they do bring this second narcotics offender information, or if they file the papers she was talking about, it's going to double his exposure," meaning "[h]e would have been facing the twenties instead of the fives and tens." (Id. at 7.) He said he explained the plea offer in some detail because he viewed it as his "duty and obligation to let a client know what he's facing, and you can't know what you're facing unless you know what you're exposed to. . . ." (Id. at 17.) Logiudice rejected the offer, as well as a subsequent offer of ten to twelve years, and the United States Attorney's office followed through on its threat to file a prior felony information. (Id. at 8.)

Mr. Bretibart testified that "[d]uring the entire representation period, [Logiudice]'s position was that he was innocent." He continued:

> There were protestations of innocence that he did not get involved in narcotics, and it was always "I did not get involved again," because he had a previous case in, I believe it was the late eighties. But he denied it, he denied it and I was satisfied. He convinced me that he was innocent.

(Id. at 9.)

Mr. Breitbart stated unequivocally that, as he learned of the government's evidence in the case, he discussed it with his client, although "a lot of the weaknesses of the case [from the defendant's perspective] didn't become evident until after the jury was selected and they started calling witnesses," some of whom were informants who "just came out of the woodwork." (Id. at 10, 26-27.) Some of his pre-trial conversations took place with Logiudice alone, and some were with Logiudice's family members present, but he could not recall whether or not Logiudice's family members were there when the two discussed the eight-year plea offer. (Id. at 17.) Mr. Breitbart explained that, although Logiudice is fluent in English, it is

Logiudice's second language and he therefore often relied on Logiudice's family members to act as interpreters because he "felt that the communication was always better when his wife and daughter were present." (Id. at 19.) Regardless, he stated: "[a]fter every time we met and talked, I was satisfied that he understood what we were talking about." (Id. at 24.)

    Mr. Breitbart did not specifically recall discussing the later plea offer of ten to twelve years, but he was certain that he "didn't keep anything from [his] client" and that he clearly explained that a conviction would result in a mandatory minimum of twenty years imprisonment. (Id. at 20-21, 23.) He stressed that he did not urge his client to plead guilty because Logiudice repeatedly insisted on his innocence. He testified: "you have to also understand that I would have felt that I would have been suborning perjury if I had either insisted on or attempted to coerce him to plead guilty with all of the protestations of innocence." (Id. at 21.) He also said he believed it "was a very triable case" and advised his client accordingly. (Id. at 11-12.) In general, however, Mr. Breitbart explained that it is not his practice to make recommendations regarding plea offers; he stated that he ensures his client is fully informed and leaves it to his client to make a voluntary decision whether to accept a plea. (Id. at 29.)[2]

    Logiudice, who is sixty-four years old and has been incarcerated for nearly nine years, testified that he was born in Sicily and immigrated to the United States in 1963, when he was nineteen years old. (Id. at 34-35, 63.) He stated that, although his first language is Italian

---

[2] Mr. Breitbart also testified that, after the verdict in this case, Logiudice's wife recounted a story of having attended a funeral with her husband, at which "certain individuals who were bad, bad guys" looked at the two of them in a menacing manner and that "as a result of that there was no way that Manny felt he could either plead guilty or cooperate because it would have been a severe threat to his family." (Tr. at 13-14.) I have disregarded this testimony as irrelevant and unreliable.

and his English has improved over time, he generally has had no trouble communicating in English with respect to this case. (Id. at 37, 42, 63.) He explained that he had been convicted of conspiracy to distribute illegal drugs in this district in 1981 and was incarcerated for eight years for that conviction. (Id. at 43.)

Logiudice recalled having had a discussion with Mr. Breitbart about the eight-year plea offer prior to trial (id. at 46), but he denied that counsel advised him that a conviction would result in a mandatory minimum sentence of twenty years. (Id. at 47-48.) He said that if he had known that a conviction would expose him to a twenty-year sentence, he would have accepted the plea offer. (Id. at 48.) He also stated that he learned of the second plea offer during the trial. (Id. at 49.) He testified that he asked Mr. Breitbart what would happen if he were to lose the trial, and counsel told him "you won't get less than 14 years" or "you get 14 years the most." (Id. at 49, 51; see also id. at 75, 76.)

Logiudice described a conversation with Mr. Breitbart immediately before his sentencing. He testified that counsel visited him in the cell and informed him, for the first time, that he was facing "19 years or 20" and that he was "shocked" because counsel had never told him he could be sentenced to twenty years in prison. (Id. at 53, 62.) He said that, had he known a conviction would expose him to a twenty-year sentence, he would have accepted an offer of ten years. (Id. at 53.)

Logiudice admitted that he repeatedly told his attorney he was innocent (id. at 60, 70), and he conceded that Mr. Breitbart never guaranteed that he could win the case and never represented that he would be able to discredit the government's witnesses. (Id. at 60-61.) He also testified that he never told his attorney that he had any difficulty understanding him and

never requested an interpreter.  (Id. at 64.)

Logiudice did not recall meeting with Ms. Avergun and Mr. Breitbart to discuss a plea deal.  (Id. at 68; see also id. at 70 ("There was no meeting, never, never, never appeared at a meeting."))  Nor did he have any recollection of being told that if he rejected the eight-year plea offer, the government would bring a charge against him that would double his sentence.  (Id. at 68-69.)

When asked whether he was, in fact, guilty of conspiring to engage in heroin trafficking, Logiudice was reluctant to admit his involvement and claimed that the government's witnesses lied.  (Id. at 72-73.)  Even his own counsel had difficulty getting Logiudice to admit his guilt:

> Q.  You said when I was questioning you on direct examination that had you known that 20 years was your mandatory minimum after trial, you would have taken the 8 years; correct?
> A.  Yes.
> Q.  And you would plead guilty to that 8 years, correct?
> A.  Yes, correct.
> Q.  Was that because you were in fact guilty?  That's the question: Are you guilty of the crimes that you were charged with?
> A.  To a certain extent, yes.
> Q.   I'm asking you, as you sit here today and you think back to the dates covering this indictment, are you guilty of those charges?  Did you commit those crimes?  Yes or no, did you commit those crimes?
> A.  I don't know how much crime I committed.
> Q.  Well, you sat at a trial for a month, right?
> A.  Yes.
> Q.  And you were tried on the indictment that was filed in 1997, correct, right?
> A.  Yes.
> Q.  And heard the witnesses testify against you?
> A.  Yes.
> Q.  Right?
> A.  Yes.
> Q.  And you heard the jury announce a verdict of guilty, correct?  Are you guilty of those crimes?  Did you commit those crimes?

> A. I was in between something, but –
> Q. No. Here's the question. If you were going to accept that 8-year plea offer, you would have had to go before a judge, like Judge Levy, and tell him that you committed those crimes, correct?
> A. Yes, correct, yes.
> Q. You would have had to admit your guilt; you understand that, right?
> A. Yes.
> Q. My question to you is, are you guilty of the crimes that you were charged with in the indictment?
> A. Yes.

(Id. at 80-81.)

Notwithstanding that admission, Logiudice continued to obfuscate when cross-examined by the Assistant United States Attorney about his involvement in the charged crimes. He testified:

> Q. And if you're guilty of the crime, what would you have said when the court asked you what you did to make you guilty, Mr. Logiudice?
> A. I would say, you know, whatever my involvement was.
> Q. And what was your involvement?
> A. I was between, between something, which I don't even know.
> Q. So you don't know what you were between?
> A. Well, I was involved with something, but not all this thing, you know, on the case.
> Q. So what you were involved in didn't relate to the case?
> A. To a certain extent, yes.
> Q. Could you explain what that means.
> A. The part I was involved was not all the testimony they did, they say these things.
> Q. Again what happened at the trial, the testimony at the trial was false, correct?
> A. No. Some no.
> Q. So what did you do?
> A. I only did just pass it to this Zeta because I don't want nothing to do, and that was it. And he took over.
> Q. And you didn't have any meetings with Mr. Kwan?
> A. No, no meeting, no.
> Q. And you didn't possess any heroin?
> A. No. I don't know where Mr. Kwan was getting it from, who was paying. There was no money. There was no money that was given to me or was –

> * * *
> THE COURT: I'm sorry, I didn't understand. Are you saying you did have involvement with Zeta or you did not have involvement with Zeta?
> THE WITNESS: Zeta, he took over on his own. I don't want a part of it. So he, he took whatever, and he would have his own client or his seller, whoever he was selling to.
> THE COURT: But what did you do that made you guilty of any crime?
> THE WITNESS: I told Zeta to take over cause I don't want a part of it.
> THE COURT: To take over what?
> THE WITNESS: Whatever he wants to do. He wants – say he want to sell drug. That's all. I don't want any part of it so he took over and –
> THE COURT: You gave him an operation to take over?
> THE WITNESS: He pass it to him cause he was – I was not interested.
> THE COURT: Then you were part of that operation at one point?
> THE WITNESS: I wasn't.
> THE COURT: You were never part of that operation?
> THE WITNESS: With him, no, cause whatever he was doing, it was his own. As a matter of fact, he went to Florida to buy coke. He got arrested. Then this was after, after he was selling heroin.
> THE COURT: Are you saying that you were never part of a narcotics operation or conspiracy that was charged in the indictment?
> THE WITNESS: Maybe you could say conspiracy because – but as far as the sale, I didn't make no sale or buy. Zeta was the one used to sell and buy, Zeta.

(Id. at 81-85.) Reading from the superseding indictment, petitioner's counsel again attempted to elicit testimony from his client about his guilt:

> Q. Now, Mr. Logiudice, between January 1992 and September 1994, did you ever . . . agree with any person to distribute heroin or any other narcotic drug in New York City – or New York, I should say?
> A. No.
> Q. You said something to the judge about Mr. Zeta, and you passed something along to him. What did you pass along to Mr. Zeta?
> A. It was drug.
> Q. Prior to passing it along to Mr. Zeta, were you involved?
> A. No, I didn't want to get involved, no.

-12-

        * * *

Q. If you pleaded guilty – if you [turned] back the clock to 1997 – and that 8 years was offered to you, what would you admit to the court to have done, what would you tell the court you did in order for the court to accept your guilty plea?
A. Right. Yeah, I was involved to a certain extent.
Q. What were you involved in?
A. The person was giving to me –
Q. What was given to you?
A. Was giving heroin.
Q. Heroin was given to you?
A. Right.
Q. Where? Where were you when the heroin was given to you?
A. In the parking lot.
Q. Was it in the Bronx, Brooklyn, Manhattan, Queens, Long Island?
A. No, in Long Island.
Q. So heroin was given to you in a parking lot in Long Island, correct?
A. Yes.
Q. And when was that, what year?
A. It was 1994.
Q. Now, who gave you that heroin?
A. Actually –
Q. Who gave it to you, Mr. Logiudice? If you know, who gave it to you?
A. It was two guys, two guys.
Q. Two guys gave you heroin. How much heroin did they give you?
A. They give me half a kilo.
Q. What did you do with that heroin?
A. I give it to Zeta.
Q. And how long did you have it in your possession before you gave it to Mr. Zeta?
A. Not too long.
Q. What does that mean? How long, a day, two days, a minute?
A. A day or two, yes.
Q. Where did you hold that heroin, where did you hold it for those two days, in your car, in your house, in your shop?
A. Well, hold outside the shop.
Q. In a storage area?
A. There's a garbage place there outside.
Q. Where is your shop located, in which county?
A. It was Great Neck Plaza.
Q. Great Neck?
A. Great Neck.
Q. That's Nassau County, correct?
A. Nassau County, right.

> Q. And there came a time that you gave that heroin to Mr. Zeta, correct?
> A. Zeta.
> Q. Did you know what he was going to do with that heroin?
> A. He say he was going to sell it.
> Q. You gave the heroin to Mr. Zeta who told you that he was going to sell it, right?
> A. Right.
> Q. And that's what you would have told the judge if you had pleaded guilty to the offer where you were exposed to 8 years, right?
> A. Right.

(Id. at 86-90.)

Jody Avergun, now Special Counsel at Cadwalader Wickersham & Taft in Washington, D.C., testified that she served in the Department of Justice from 1990 to 2006. (Id. at 91-92.) In 1997 she was an Assistant United States Attorney in the Eastern District of New York, and she recalled the investigation of a drug trafficking operation involving Logiudice. (Id. at 92.) She described a meeting in her office with Logiudice and his attorney, in which her aim was to convince Logiudice to cooperate. (Id. at 93.) She did not specifically recall making a plea offer or discussing the filing of a prior felony information, but she stated that it was her practice generally to use a prior conviction as "leverage to obtain a plea and cooperation because the increase in sentence was so vast." (Id. at 94.) She also stated that it would have been unusual to have a meeting in her office with a defendant and his counsel unless her purpose was "to discuss a plea or to convince him of the strength of my case so that he would agree to plead and cooperate." (Id. at 97.) She further explained that "[t]here was no cooperation without a plea on the table, it was both." (Id.)

As petitioner concedes, the Second Circuit requires more than a defendant's self-serving post-conviction testimony to establish a "reasonable probability" that he or she would

have accepted a plea agreement.  See Boria, 99 F.3d at 497; see also Johnson v. Duckworth, 793 F.2d 898, 902 n.3 (7th Cir. 1986) ("[Petitioner] cites no evidence prior to his conviction which would indicate any desire on his part to plead guilty to a lesser charge.  Under these circumstances, we seriously doubt whether [petitioner]'s after-the-fact testimony regarding his wishes in and of itself would be sufficient to establish that prior to trial, but for [counsel]'s actions, there was a reasonable probability he would have accepted the plea agreement."). Petitioner contends that, in addition to his testimony, there is "objective evidence" to support his claim, namely the disparity between the government's pre-trial plea offers and the mandatory minimum sentence.  (See DeMarco Ltr. at 4.)  It is true that a substantial gap between the actual maximum sentence that could be imposed following trial and the sentence that trial counsel represented as the maximum potential sentence, in combination with a petitioner's credible assertion that he would have accepted the plea had he been properly informed, can support a finding of a reasonable probability that the outcome would have been different but for the erroneous estimation of the potential sentence.  See Gordon, 156 F.3d at 380-81.  However, I am not convinced that Mr. Breitbart underestimated Logiudice's sentencing exposure.  Mr. Breitbart testified clearly and persuasively that he informed his client that a conviction would result in a mandatory minimum of twenty years imprisonment.  (Tr. at 20-21, 23.)

Although Logiudice claims that he first learned of the potential twenty-year sentence just a few minutes before the sentencing was to take place, that assertion is not credible. For one thing, at the sentencing hearing Logiudice's wife and daughter made prepared remarks in opposition to a twenty-year sentence.  (See Sentencing Transcript, dated Apr. 2, 1999, at 8, 13.)  It strains credulity to believe that Logiudice's family members knew he was facing a

-15-

possible sentence of twenty years, but Logiudice himself was unaware of that possibility.

Moreover, although Logiudice denies ever having met with Ms. Avergun in her office, both Ms. Avergun and Mr. Breitbart recalled the meeting, at least generally. As Ms. Avergun explained, it would have been highly unusual for her to meet with a defendant in her office other than to discuss a cooperation agreement. (Tr. at 97.) In addition, it was her practice, as a federal prosecutor, to threaten to file a prior felony information, with a substantial increase in the potential sentence, in an effort to gain a defendant's cooperation. (Id. at 94.) In light of her testimony, as corroborated by Mr. Breitbart's, this court is hard-pressed to believe that Logiudice was never informed that he was facing a possible twenty-year sentence.

More importantly, the record is clear that Logiudice consistently maintained his innocence and was resolute in his decision not to plead guilty in this case. Even at the hearing, where Logiudice's primary purpose was to convince the court that he would have pled guilty had his counsel advised him appropriately, Logiudice was evasive about his guilt and gave confusing and often incomprehensible testimony in response to clear, straightforward questions. In light of the evidence presented at the hearing, I find Logiudice's claim incredible.

CONCLUSION

For the reasons stated above, I respectfully recommend that petitioner's motion to vacate his sentence be denied. Any objections to this Report and Recommendation must be filed with the Clerk of Court, with courtesy copies to Judge Johnson and the undersigned, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. See 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Respectfully submitted,

/s /
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
November 9, 2007